Next case this morning is 21-4068 Rodriguez v. Cache County Corporation. Counsel for appellant, when you're ready, please make your appearance and proceed. Your honors, may it please the court, my name is Wayman Stoddart and I represent Nancy Rodriguez both in her individual capacity and in her capacity as a personal representative of the estate of Jose Mena, the decedent at issue in this case. Ms. Rodriguez appeals from the judgment of the First District, District of Utah, on the following bases. First, that the District Court erred in granting Cache County Corporation's motion for summary judgment because genuine issues of material fact regard the incarceration and death of Jose Mena, Cache County Corporation's affirmative policies, Cache County Corporation's failure to comply with their pre-existing and existing suicidal prevention policies, and they are not entitled to judgment as a matter of law. And the second related prong is that the District Court erred in failing to draw reasonable inferences in favor of the plaintiff, the non-moving party. Contrary to the legal standard of review, to be applied when considering a motion for summary judgment. Your honors, recently, Appellee filed with this court a notice of supplemental authority citing to George v. Beaver County, a 2022 opinion of this court. And I want to kind of frame the arguments that are going to be presented from Appellant's side in context and in light of George v. Beaver County. So George v. Beaver County is instructive in that it clarifies that contrary to Appellee's assertions in their brief, Appellant does not have an obligation to demonstrate subjective knowledge on the part of Cache County Corporation with regards to and in context of the affirmative policies enacted by Cache County Corporation. Instead, George v. Beaver County provides, quote, a showing that, sorry, provides that Appellant is required to, quote, show that an official policy or custom, two, caused the plaintiff's constitutional injury, and three, the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring. The facts of this case have been presented to the court. Jose Mena was married to Nancy Rodriguez. She called Logan City Police Department, reporting specifically concerns that Mr. Mena was going to hurt or was threatening to kill himself. Logan City Police Department responded. Mr. Mena was taken into custody, and all the relevant parties, Mr. Mena, Ms. Rodriguez, and their children were interviewed by Logan City Police Department. In the interviews, which are documented quite extensively, each officer involved recognized that Mr. Mena had presented a risk of suicide through the testimony of Nancy Rodriguez as well as the testimony of the children. He was then submitted to Cache County Corporation, who operates Cache County Sheriff's Office Prison Facility or Jail Facility up in Logan, Utah. And in relation to that, the police officer's warrantless arrest statement was submitted to Cache County Corporation. In light of those facts, Your Honor, I would like to address the three prongs presented by George v. Beaver County. So first, appellant must show that an official policy or custom. Here, appellant has done this well beyond the requirements necessary to satisfy a motion for summary judgment. Appellant bears the burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. However, the Supreme Court has established that summary judgment will not lie if the dispute about a material fact is genuine or a reasonable jury could return a verdict for the non-moving party. And this is Anderson v. Liberty Lobby. It is not necessary that a issue be concluded in favor of the party asserting its existence. Rather, only a sufficient evidence supporting the claimed factual dispute be shown is required to allow a judge to let the issue proceed to a jury. And that's Anderson. Well, let me ask this. As I understand it, one of your arguments is that there was a municipal, well, that there was a policy of Cache County that was widespread enough to qualify for purposes of a policy for municipal liability of the deputies failing to ask the transport officers about inmate suicidal tendencies. Is that right? In a certain way, Your Honor. There's two policies that are at issue. The first is similar to George in that it's a failure to comply with policies that exist. And that's the one Your Honor is referencing. So there are written policies of Cache County that instructed their inmate intake officers to ask questions of the transporting officer. And it's Plaintiff Appellant's contention that those were not followed in this case. But in order for them to attach liability to the county, in order for them to be more than one-off acts of negligence by county employees, that would have to be a widespread practice that would be a de facto policy, would it not? Yes, Your Honor. And what basis is there to say that it was a widespread policy? As I understand it, all you've got is the testimony of Deputy Peterson and the testimony of the county 30B6 person who said, well, sometimes policy diverges from practice. Do you have anything else that would make this a widespread policy of deviation? Your Honor, I think the appendix in the record is clear that it was not just Deputy Peterson, but it was other deputies. Deputy Peterson was the one cited to in the brief. But the appendix contains other references by other officers that say they did not have a standard set of questions they would ask of the transporting officer. The testimony states that the transporting officer was sometimes there, sometimes not. If you look at the testimony of Cordell Hoth. Let me hit a pause button. Deputy Peterson is the only one cited in the brief. That's correct. Well, I'm not supposed to be looking through the record unless you're identifying for me what I should be finding. So if you're not telling me in the brief what is the basis for this de facto policy, why is this Court obligated to look and find it? Your Honor, and I understand that argument. I'm also pointing to what was discussed in the brief, the testimony of Nathan Argyle and Cordell Hoth, which states that in many cases the arresting officer wasn't even the transporting officer. And so the policy to ask questions of the arresting or transporting officer would not apply there either. And that's part of the widespreadness. But to answer Your Honor's question, there is an additional policy that has been asserted by plaintiff and that is covered in the brief. And that is the intentional policy of Cache County not to read the probable cause statements that are submitted to it. And, Your Honor, that is an affirmative policy outlined in the 30b-6 testimony that was addressed on the briefing. And so there are two policies at issue. One, like the George Court, is a failure to comply with preexisting policy. And so in that case, Your Honor, I would agree that there needs to be a showing of widespread and pervasive failure to follow that policy. But the other is the affirmative policy of Cache County instructing its jail staff not to read probable cause and arresting documents. And remind me, what is the predicate for that policy? What is your support for the existence of that affirmative policy? Certainly, Your Honor. So that's the 30b-6 testimony provided by Cache County where the 30b-6 deponent testified that it was their policy not to read arresting officers' transportation. And he provided some justification, which was that they were concerned about the heinousness of certain crimes. And that was why they didn't read it. But that it was their policy that no member of jail staff would review the arresting officers' probable cause statement or other documents submitted to the jail. Was there any evidence that there was any other incidents in the history of the county where the failure to read the probable cause affidavit had resulted in further medical problems? There is no specific examples where the two have been tied together. There have been other examples of times where medical needs were not met or where potential issues occurred. There are examples of that throughout the entire history of the jail. As far as the relationship between the two, whether it was in the probable cause statement and then that was part of the injury, that's not information that we've been able to get. No cases exist on that point. Well, again, I'm not asking about cases. Well, cases in the sense of what's in federal court or anything like that. But I'm just asking factually. There's no evidence that the failure to read the probable cause affidavit had resulted in a problem like we have in this case. There's no evidence specific to this jail, no. Well, then using your rubric earlier, which is the standard rubric of deliberate indifference, what basis would there have been for the county to have deliberate indifference, even if this affirmative policy existed, not looking at the arrest reports? What basis would there be for them to be deliberately indifferent for the conduct that took place here? And that, I think, is piggybacking on Judge Bacharach's point, which is simply there is no nexus. And if there's no nexus, what would have allowed them to know, well, I tell you what, if we don't change our policy, somebody's going to die? Certainly, Your Honor. So, again, George V. Beaver County is instructive on this point. It isolates two different ways that you can demonstrate deliberate indifference. The first is what we've discussed so far, a pattern of constitutional violations sufficient to show just deliberate indifference. However, there is a corner case that exists where evidence of preexisting pattern of violations are not necessary in a narrow range of circumstances in which the unconstitutional consequences of a policy are highly predictive and patently obvious. This is Walder V. City County of Denver. That's a Tenth Circuit case from 2019. And it's narrow. And so how do you fit into that narrow range here? What is there about this that makes this so obvious, the risk so palpable, that they should have responded? Certainly, Your Honor. So there's a few things that make the risk palpable. Number one, Cache County Jail solicits inmates from various other jurisdictions, including, in this case, the Logan City Police Department. And the failure to communicate between those different jurisdictions is especially poignant when you do not read the arresting officer's probable cause statement. So you request, as Cache County does, Cache County insists that other jurisdictions submit those probable cause statements. And, Your Honor, that's Appendix 36, sorry, Volume 1, Page 36 of the appendix, is specifically that arresting officer's warrantless arrest report. And in there, it does specifically discuss the risks Mr. Mann opposed of suicide. That document has been stamped by Cache County. That document was filed by Cache County. So there's no question that they require other jurisdictions to give them that information. So clearly, that value of that information is recognized. The policies that do exist specifically state that it's important to talk to the transporting entities and that the risk of suicide is a sufficient one that it requires us to gain information from all available sources. So that's the second prong. The third prong, Your Honor, that we would argue is the uncontested, currently, testimony of plaintiff's expert who was submitted to the trial. Plaintiff's expert discussed how Utah has a pervasive and ongoing problem with jail suicides that is widely known, has been featured in multiple articles, and is essentially a subject for sufficient and substantial public scrutiny. How about Cache County? There was nothing specific to Cache County in the expert's report, just Utah generally. Well, why does that work? I mean, Cache County has a setup at its jail, has its own institutional policies, never has a suicide before. Why does the risk become palpable that if I don't do X, there's going to be a suicide that follows if I have not done X, historically, and there has been no suicide? Your Honor, I would argue that the combination of all of the other factors create environments similar to the case that you just heard, where the culmination of the environment that exists is sufficient to put the county on notice of that, especially when, Your Honor, I would ask the county the same question. Why are you requesting that the officers give you that probable cause statement and those reports? Why is that a critical part of your policy? Why do you receive those documents, recognize receipt of those documents, if you aren't going to read them? And that goes to the final point, Your Honor, which is a plain reading of what deliberate indifference means in this context. The county was deliberately indifferent to a document in their possession that stated that Mr. Mena was at risk of suicide and Mr. Mena committed suicide. There's no question, and this is the testimony of all of the different members of Cache County staff, that had they known what was in those pieces of paper, their behavior would have been different. So the only thing that led to the circumstances of Mr. Mena's death was the failure of Cache County to read a document that by their own stamp was in their possession prior to Mr. Mena's suicide. And that affirmative policy pulls us out of the discussions that George is talking about. Because, again, George v. Beaver County is talking about a failure to comply with policies in existence. It's saying we have the policies, you didn't follow them. And in this case, they have the policy, it was followed, and Mr. Mena died. And, Your Honor, I'd like to reserve the rest of my time for rebuttal. That's fine. Thank you, Your Honors. And may it please the Court, I'm Spencer Brown and I represent Cache County. Okay, Mr. Brown. You have an affirmative policy, you don't follow it, he dies. Why doesn't that lead to municipal liability? That's the last thing we heard before opposing counsel sat down. Your Honor, the affirmative policy that the evidence is that wasn't followed is requiring the intake deputy to ask questions of the arresting officer about the condition of the inmate or the arrestee that's being brought in. Admittedly, there's a dispute of material fact as to whether Deputy Peterson did that. But that is, as the Court noted before, that is a one-off act of negligence. No, I think the policy that we're speaking of now is the alleged affirmative policy of Cache County not to read the arrest documents that are submitted by the transporting officer. That you ask for those documents, they sit there in your possession, you don't read them. And if that information had been read, the argument goes, they would have acted differently and he wouldn't have died. Right, Your Honor. And the reason why that doesn't lead to municipal liability is because Ms. Rodriguez can't show that this was substantially certain to result in a constitutional violation to her husband, that we didn't maintain that policy with deliberate indifference to her husband's care. And tell me why. There's two reasons for that. Number one, Cache County has extensive policies to screen inmates and to monitor inmates for risk of suicide and risk of self-harm. There's no evidence that those other policies, with the exception of the questions at intake, were not followed. This goes not only to intake, it goes to booking, and then it goes to the entirety of the inmate's incarceration. Number two, there's no evidence of a pattern of unconstitutional behavior here. There's no evidence that we'd failed to read these probable cause statements before, and that by so doing it led to a suicide or it led to another serious health concern. There's no evidence that this is a policy that's so egregious and so obvious to lead to a suicide that we don't need a pattern. And in the George case, it makes clear that without or the absence of a pattern, there cannot be municipal liability unless this is a case that's so obvious. The reason why it's not so obvious that this policy of not reading probable cause statements would lead to suicide is because of the extensive suicide prevention policies that the jail has implemented and incidentally has successfully implemented. There's no record evidence of a suicide at this jail. Beyond that, it's undisputed that Cache County and its officers did not know that Mina was suicidal. I think the facts of this case are important. When Mina came to the jail during his intake, he denied that he was suicidal. He denied that he would try to harm himself at the jail. Deputy Peterson observed his behavior and found his behavior to be normal. During booking, Deputy Atwood asked him a series of more detailed questions to assess his mental health. None of his answers gave warning signs that he was suicidal. Deputy Atwood also observed his behavior at that point in time and found him to be normal, found him to be in relatively good spirits considering his circumstances. They had a normal conversation. They had a conversation about a relative of Deputy Atwood's that Mr. Mina knew. Throughout the time that Mr. Mina was in jail, he was originally placed in high security because of the violent nature of his alleged crime and then was moved into general population. Throughout the time there, he never exhibited outward signs of potential for self-harm, potential for suicidal behavior. How does that fit into the analysis? It was 13 days later that he committed suicide. It wasn't that evening or something. Does that matter? I think it does. I think it does matter, Your Honor, because our policies require ongoing monitoring of prisoners, right? And it's not as formal as it is during the booking and during the intake process, but the prison staff is continually monitoring for signs. I think the other fact that's important to note is that during the intake process and during the booking process on September 3rd, the day that he was arrested, we did not have the probable cause statement. The probable cause statement came in on September 4th. Now, even with all that, assuming that somebody had read the probable cause statement, there's still insufficient information to demonstrate that we were deliberately indifferent to Mr. Mina's risk of suicide. Even if we had taken the probable cause statement and said, okay, the night that he was arrested, he was having problems, everything that had gone on since then, that for the 13 days that he was arrested, demonstrated that his mental health and that his mental status was stable and he was not demonstrating anything that showed that he was suicidal. The cases in the Tenth Circuit are clear that there has to be a subjective knowledge of the inmate's suicide, that failing to follow jail procedures that deny you that subjective knowledge are not necessarily enough to, again, impose liability on a municipality. Wasn't there, refresh my memory on this, was there not a fact issue, and I don't mean that necessarily in genuine issue of material fact, but wasn't there a fact question about whether the transporting officers told Deputy Peterson about his suicidal circumstances? Yes, there is a fact question about that. And the way that that fact question comes up, Deputy Peterson, when he was deposed, he didn't recall what the transporting officers told him. What he testified is that if they had told him that Mr. Mina was suicidal, he would have checked the box on the arresting officer information sheet indicating that Mr. Mina was suicidal, and he didn't do that. The transporting officers, or rather another officer, one of the arresting officers who was not the transporting officer. And why is that even sufficient evidence of anything? I mean, that other officer just said, hypothetically, this is what we do. Why couldn't an officer win in Argyle and the other? Why couldn't they have testified? I don't know why they weren't deposed, Your Honor. I don't think that that's sufficient evidence of what that officer would have done in that situation. At any rate, even if that does create an issue of material fact, at best, this shows one officer's failure to follow Cache County jail policies. The jail policies are clear that the intake deputy is supposed to ask the transporting officers questions about the health and about the circumstances of the arrestee's arrest. They're supposed to ask for information that they know. That policy is well spelled out in the jail policies. And in the case law, particularly in the George case, this Court makes clear that failure by one officer to follow that policy doesn't impute liability to the municipality. That would be responding to superior liability. And this Court, the Supreme Court, and every other circuit has rejected responding to superior liability. Correct. I didn't see in your brief much discussion, and perhaps I missed it, on the Utah's unnecessary rigor clause and the case law that supports your position on that. What would be your strongest case in that regard? Your Honor, the unnecessary rigor clause, it follows that there's admittedly not a lot of case law. There's two Utah cases. There's this Bott v. DeLand 1996 case and then the more recent Dexter v. Bosco case. The unnecessary rigor provision is kind of an addendum to the cruel and unusual punishment provision in Utah's Constitution. And what it says is the cruel and unusual punishment provision is seen as going to the imposition of a sentence that would be cruel and unusual. Unnecessary rigor goes to the institutional treatment while someone is incarcerated. But what Ms. Rodriguez has to show to make out an unnecessary rigor claim, she has to show that there's treatment that is clearly excessive and unjustified. And the Dexter v. Bosco case says that that could be liability for only a flagrant violation of the unnecessary rigor clause. In order to get there, there has to be an obvious and known serious risk of harm. And as we've discussed in this case, it's undisputed that the Cache County jail officials and the Cache County itself did not know that Mina was at serious risk of suicide. And then the official has to act without reasonable justification. Here, there's no evidence that anybody at the Cache County jail acted without reasonable justification in failing to take steps to prevent Mr. Mina from committing suicide. Again, because they didn't know that he was suicidal. The only thing under the facts of this case that they could possibly suggest is that, well, the necessary step is to put every inmate on suicide watch. And that would just be unacceptable. The rigors, the extreme policies of suicide watch, where you're removing inmates' belongings, you're removing bedding, you're putting them in a suicide smock, putting them in dry cells, those are things that would make the prison all the more, or the jail, all the more inhumane. That certainly wouldn't be a policy that I think anybody would advocate for. So under these circumstances, especially where nobody knows that Mr. Mina was suicidal, they can't make out an unnecessary rigor claim. Your Honors, unless the Court has any additional questions for me, I will... Can I ask one question? Yes. Just on the Bunnell issue, is there a problem in your position with regard to the explanation from the 30 v. 6 witness? On its face, it makes sense that the circumstances that are elucidated in the probable cause affidavit may suggest heinousness, child pornography. Pedophilia would be a primary example, where you're really trying to protect the accused. But in a situation like this, where there's really nothing about the heinousness, the applicability of that explanation really wouldn't make sense here, that the policy just was too unequivocal. It didn't have some sort of screening mechanism for some, say the sheriff, or someone to look at the probable cause affidavit and see, is there really a legitimate reason not to make this probable cause affidavit more widely known? And if it did indicate some sort of heinousness, then it was going to be insulated, as the 30 v. 6 witness explained. But if it did have none of that, but also some sort of red flags that it would be a marker for how this accused should be treated, i.e. that he or she was suicidal, then it should be more widely known that the policy reflected deliberate indifference because it didn't have any screening mechanism. Your Honor, I understand where you're going. There could be a different way to execute this policy to continue to protect inmates and to shield them from jail staff widely knowing the details of the allegations against them while giving jail staff the opportunity to know of any potential mental health concerns that come about in the probable cause statement. Two responses to that. Number one, the case law, and I think particularly George discusses in the context of officer training that more or better training, or in our context more or better policies, doesn't necessarily show deliberate indifference. And here I think that in light of all of the other jail policies that have worked, that have presented suicide, the court would be hard-pressed to find that executing this policy that's intended to protect inmates in other ways and in other circumstances shows a deliberate indifference to the risk of inmate suicide when the jail has and is executing other policies and is doing so successfully.  Thank you, Your Honors. Your Honors, I just want to briefly address a few points that were raised. First, the county opened with the statement that there is a dispute of fact regarding what questions were asked and what conversations were had at the intake process. Cache County policies are extensive in that they discuss the fact that it is specifically important, recognized by Cache County as being specifically important, to get information from the transporting and arresting agency. That is of critical importance. It's recognized in their policies up and down. And there is a disputed fact over whether or not that happened in this case. There's a disputed fact over whether information was conveyed, over whether questions were asked. To answer the court's questions, Nathan Argyle and Cody Hoth, the listed transporting officers, were deposed. Those depositions did occur. Those officers did not have any recollection of transporting, and all the documents relating to the transport were in the current capacity of Cache County. And so those depositions were not particularly helpful because they didn't have anything to reference to refresh their recollection. With that in mind, the only two locations that there could possibly have been communication between Logan City Police Department and Cache County Corporation were, one, at the intake process where there is a question of fact regarding what happened, and two, when Logan City complied with Cache County's requirement to give them the probable cause statement. The failure of Officer Peterson to comply with the policies at the first date, as alleged by plaintiff, both motion for summary judgment, the inference be drawn in their favor, was responsible for the failure at that point. And the intentional policy not to read the probable cause statement was intentional. May I finish my thought? Finish your thought. Was responsible for that failure at the second point. Both were failures, and both led directly to Mr. Manna's suicide. And on that, we would submit your honor. Thank you. Thank you, counsel, for your fine arguments. Case is submitted.